UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **TORY RIES,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | |
| | § | **CIVIL ACTION NO.** |
| **CITY OF SAN ANTONIO,** | § | |
| **LIEUTENANT LOPEZ, SERGEANT D.** | § | **Hon.** |
| **CONTRERAS, and OFFICER VALERO,** | § | |
| *Defendants.* | § | |

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

---

NOW COMES Plaintiff, **TORY RIES,** by and through his attorney, Brandon J. Grable of Grable Grimshaw PLLC, complaining of Defendants **CITY OF SAN ANTONIO, LIEUTENANT LOPEZ, SERGEANT D. CONTRERAS,** and **OFFICER VALERO,** and respectfully alleges as follows:

### I.
### INTRODUCTION

1.      In this State, citizens have a right to film police performing government functions in public.  Citizens also have a right to carry handguns into public spaces of municipal buildings (unless otherwise prohibited by State law).  Citizens also have a right to assert complaints about the display of signs that portray city policy that is contrary to state and federal law.  In exercising each of these rights, Tory Ries, pursuant to the policies, practices, and custom of the City of San Antonio and the San Antonio Police Department, was retaliated against while attempting to inform the City and its employees of unlawful conduct.  Tory Ries, in engaging in First, Second, and Fourteenth Amendment activity, was unlawfully detained, arrested, and spent over 35 days in jail,

charged with five separate crimes—all of which were dismissed in his favor, and indefinitely criminally trespassed from all city-owned public property without any lawful basis.

2.      TORY RIES, a law-abiding citizen, brings this civil action for damages and declaratory relief against the CITY OF SAN ANTONIO (including the MAYOR, CITY COUNCIL, CITY MANAGER, and the SAN ANTONIO POLICE DEPARTMENT with its POLICE CHIEF), LIEUTENANT LOPEZ, SERGEANT D. CONTRERAS, and OFFICER VALERO, for unlawful policies which violate the rights of citizens of the State of Texas and for retaliatory conduct in response to Plaintiff exercising his First Amendment right to seek redress for grievances from the government, his First Amendment right to film police encounters, and his Second Amendment right to carry a concealed handgun consistent with the laws of the State of Texas. The unlawful policies include the City of San Antonio's posting of signs contrary to State of Texas weapons laws and the enforcement of such by San Antonio Police Department (SAPD) officers. The retaliatory conduct includes the unlawful seizure of Plaintiff by Defendant Officers, the criminal trespassing of Plaintiff by Defendant John Does, and the ratification of officer conduct by the City of San Antonio Police Department's Internal Affairs department. These incidents clearly violated Plaintiff's rights afforded to him under the United States Constitution and the laws of the State of Texas. Plaintiff was harmed and seeks recovery in this lawsuit.

3.      Plaintiff alleges that the CITY OF SAN ANTONIO and its policymakers, City Manager ERIK WALSH, Mayor RON NIRENBERG, Chief of Police WILLIAM MCMANUS, and the City of San Antonio, and all City Council members (collectively referred herein as the "Policymakers") not only failed to uphold the laws of the land and to abide by the Constitution of the United States of America.

4.      Plaintiff was harmed and seeks answers and compensation in this lawsuit for their damages.

## II.
## JURISDICTION AND VENUE

5.      This is a civil rights action in which the Plaintiff seeks relief for the violations of his rights secured by 42 U.S.C. § 1983 and the First, Second, and Fourth Amendments.

6.      Jurisdiction of this Court is found upon 28. U.S.C. § 1331.

7.      Venue is properly laid in the Western District of Texas under 28 U.S.C. § 1391(b)(2).

8.      The events that gave rise to this lawsuit primarily took place at 515 South Frio, located in San Antonio, Texas, in Bexar County.

9.      Pursuant to 42 U.S.C. § 1983, and other applicable laws, the Court may award nominal, compensatory, and punitive damages, as well as equitable relief against all of the Defendants in their individual capacity for the violations of Plaintiff's Constitutional rights and harm caused by their actions/inactions.

## III.
## PARTIES

10.      Plaintiff TORY RIES ("Plaintiff Ries") is a law-abiding citizen of the United States and a resident of the City of San Antonio, County of Bexar, State of Texas.

11.      Defendant CITY OF SAN ANTONIO ("Defendant City") is a political subdivision of the State of Texas, acting under color of state law, and is a person for the purpose of a 42 U.S.C. 1983 action.  Defendant City is responsible for the policies, practices, and procedures of its Police Department and individual officers.  Defendant City is also responsible for the policies

implemented, endorsed, and enforced by its Policymakers and the ordinances passed by its Councilmembers and Mayor.

12.    Defendant LIUETENANT LOPEZ ("Defendant Lopez") was at all pertinent times a police officer employed by the City of San Antonio and was at all pertinent times acting under color of state law in the performance of his duties as a San Antonio police officer.

13.    Defendant SERGEANT D. CONTRERAS ("Defendant Contreras") was at all pertinent times a police officer employed by the City of San Antonio and was at all pertinent times acting under color of state law in the performance of his duties as a San Antonio police officer.

14.    Defendant OFFICER VALERO ("Defendant Valero") was at all pertinent times a police officer employed by the City of San Antonio and was at all pertinent times acting under color of state law in the performance of his duties as a San Antonio police officer.

15.    Each and all acts of the Defendants alleged herein were committed by said Defendants while acting within the scope of their employment with Defendant City, including Defendant City's Police Department.

16.    Each and all of the acts of Defendant Officers were committed by these Defendants despite their knowledge that they were engaging in unlawful and unconstitutional acts, and yet they did them anyway, knowingly, recklessly, intentionally, wantonly, callously, purposely, purposefully, sadistically, cruelly, deliberately, and/or with deliberate indifference, gross negligence, and/or reckless disregard.

**IV.**
**STATEMENT OF FACTS**

**A. Background**

17.    Right before the Covid-19 pandemic shut the world down, Plaintiff Tory Ries suffered the devastating end of a three-year relationship with his then girlfriend. A veteran already

dealing with PTSD, a traumatic brain injury, and severe anxiety, Plaintiff Ries suffered a brief mental breakdown. San Antonio Police Department officers were called out to perform a mental health check on Plaintiff. During this call for service, the officers determined he needed to go in for a mental evaluation. A scuffle ensued, and Plaintiff's left collar bone was broken. Plaintiff was restrained, and he ultimately received the treatment he needed. Today, he is still thankful for the actions of these officers and for the help they provided him during that very dark time.

18.     Unfortunately, pain and fear are not always so logical. Following these events, Plaintiff noticed that he started having severe anxiety anytime he saw a police officer. His body remembered the pain (unintentionally) inflicted upon him during his previous encounter with law enforcement officers and panicked any time he saw an officer. Plaintiff decided that this fear was not only unreasonable but also detrimental. He decided to quietly treat himself by using self-directed exposure therapy. Any time he saw an officer of the law, he would make a point of approaching them with the intent of engaging in a civil conversation. The goal was to show his body that not all law enforcement officers are dangerous or bad and that not all encounters end in pain.

19.     The therapy worked except for one major inconvenience: Every time Plaintiff approached an officer, his anxiety heightened. This anxiety, combined with his disabilities, left him stuttering and stumbling in front of these police officers. More than one officer commented during these interactions that Plaintiff Ries looked intoxicated. To avoid potential charges for public intoxication, Plaintiff started filming these encounters, so he could prove his actions were caused by anxiety—not alcohol.

20.     While this filming solved the first problem, it created a second problem.

21.     While walking past 515 South Frio Street, the San Antonio Police Department Central Substation, one day, Plaintiff, who was not filming at the time, overheard an officer telling a female victim with a license to carry that she could not enter the police department lobby while armed to file her police report.

22.     Concerned that this police officer was ordering this lady to disarm in violation of state law, Plaintiff approached and tried to correct the officer's erroneous understanding of the law.  The officer would not listen.  He first justified his actions by pointing to a "No Guns in City Building" sign, but, when pressed, the officer later informed Plaintiff that he did not care what the law said.  He then threatened the victim with arrest if she entered the public lobby of the police department to file her police report.  The victim left the police station to store her handgun in her car; this recent victim then walked the distance back to the police department (the Central substation has no public parking; members of the public must park at the next-door municipal court or elsewhere)—unarmed and with limited means to protect herself—to make her report.

23.     This was not the only time Plaintiff heard about law enforcement officers misapplying or straight-up ignoring state laws.  Because Plaintiff sought out encounters with law enforcement officers, he had frequent conversations with a variety of officers providing him ample opportunities to hear their opinions on the matter; because Plaintiff recorded his interactions with officers (to prove he was just anxious, not drunk), he sometimes captured events like this one or conversations showing these officers' erroneous opinions.  For instance, a whopping eighty percent of the officers he spoke to were not aware that licensed individuals could enter a police lobby or other public area of a police department while armed with a handgun.

24.     Plaintiff felt a strong duty to these officers and to the public.  He was in the unique position of having both the knowledge and the interactions needed to give these officers the

information their training had failed to provide. During these conversations, he tried to equip these officers with the knowledge they needed to avoid making unlawful arrests. Once constitutional carry passed and the laws changed, he also tried to help educate officers on the changes. Despite his efforts, again, a concerning eighty percent of the officers he spoke to expected individuals to comply with their directions—even if they were unlawful—and would arrest individuals for abiding by the law, rather than the officer's erroneous understanding of it.

25.     When educating individual officers failed to produce the needed change, he reached out to their chain of command, hoping their supervisors could request and receive guidance on the matter, before passing that information on to their officers. Still nothing ultimately changed.

26.     Then George Floyd and other incidents started making national headlines.

27.     As described further below, Plaintiff also started being falsely charged with bogus crimes. He would win at court, but nothing would change. Each win cost: time spent in jail and money for bail bonds; time spent in court and money for attorneys. Each win ultimately achieved nothing. Officers kept arresting or threatening to arrest law abiding citizens. Plaintiff began to fear that a point would come when citizens, tired of being punished for doing things legally, would decide to stop trying to abide by the law. Then what would happen?

28.     Plaintiff has tried to affect change by educating officers, by bringing these matters to the attention of their supervisory officers, and by alerting the city council and the city attorney's office to the problems, but nothing ever changes. At last, having run out of other options, Plaintiff finds himself with one last option he never intended to pursue. Plaintiff has now decided to sue Defendant City (and other Defendants) with the hopes that this lawsuit will finally correct these issues for good.

29.     To this purpose, Plaintiff Ries directs Defendants, the Court, and all readers to the below issues.

**B. Events Giving Rise to This Suit**

30.     On April 26, 2021, Plaintiff Tory Ries was walking down the sidewalk next to the San Antonio Police Department Central Substation and across from the San Antonio Fire Department, Station 11.



31.     As he passed the back parking lot—a fenced lot with open gates and easy access from the sidewalk—he noticed police officers transferring items from personal cars to patrol cars. Curious about the events that were occurring—since the officers were not in the restricted lot where they usually park their vehicles, Plaintiff decided to film the activity.

32.     Plaintiff entered the lot and started recording with his cell phone. As he stood there, watching and recording from a distance, some of the officers present noticed he was filming their actions. Defendant City's police officers told Plaintiff to move further away.

33.     Plaintiff complied with this order.

34.     However, one of the officers decided he was still not satisfied. He told Plaintiff that he was not allowed to stand in the parking lot because it was a police-only restricted parking lot. Plaintiff asked how the parking lot could be restricted to police officers only if they had signs posted for 10-minute, visitor-only parking spots? He pointed out the signs to the officers.

35.    An SAPD sergeant present ordered Plaintiff to leave the area.

36.    Even though Plaintiff thought the police officer was making up restrictions to force him to leave, Plaintiff ended his recording and left anyway.  As he left, he informed the officers that he thought their claim was illegitimate.

37.    Defendant City's officer did not like being called out by Plaintiff.  She followed Plaintiff out onto the sidewalk and arrested him for Criminally Trespassing on Private Property.

38.    Plaintiff was brought before the magistrate the next day, and his bond was set at $200.00.  Plaintiff refused to pay it.  Plaintiff was then offered a $20 personal recognizance bond. He declined that bond as well and insisted on his right to a timely trial.  If Defendant Officers were going to falsely arrest and charge him, Plaintiff wanted this matter dealt with sooner rather than later.  He did not want Defendant Officers to have the satisfaction of their malicious actions hanging over his head for months.

39.    Since he declined paying bail, Plaintiff sat in jail, waiting and waiting for his arraignment.  Finally, prosecutors informed Plaintiff they could not adhere to his right for a timely trial—on a simple criminal trespass charge.  They also refused to dismiss the charge.

40.    After twenty-four (24) days of sitting in jail for criticizing Defendant City's finest, Plaintiff Ries was finally released—read: "booted"—from the Bear County Adult Detention Center.

41.    This petty, retaliatory charge was finally dismissed (Rejected – Declination) on March 3, 2022, (almost a year later) because the officers could not prove using their body worn camera (BWC) footage that Plaintiff had ever been given a criminal trespass warning (CTW)— even though the officer who claimed the parking lot was a restricted area tried to claim during the course of that case that he had given Plaintiff a CTW.

42.    On Tuesday, May 25, 2021, five days after his release from jail, Plaintiff returned to the Central Substation, intent on proving that there were no restricted signs posted.[1]  After filming the lack of signs, Plaintiff entered the public lobby of the police department to ask about the locations of the alleged restricted areas, so he could avoid entering them in the future.  Even after spending almost a month in jail for a falsified arrest, Plaintiff wanted to abide by the law— even if that meant abiding by a criminal trespass warning he was never given.  Like always, Plaintiff Ries continued filming his interactions with the officers.  Defendant City's officer, FTS Sergeant Ling (Badge #3304) approached Plaintiff in the lobby and told him that it would not be tolerated if he continued filming.  Sergeant Ling went so far as to threaten to arrest Plaintiff if he did not cease recording.

43.    Defendant City's Sergeant tried to justify outright prohibiting Plaintiff's First Amendment right by claiming that the substation sometimes interviewed *rape* victims . . . in their *public* lobby.

44.    He then further threatened Plaintiff by informing him that the area where the night magistrate was holding court (at the time of Plaintiff's visit) was a restricted area and that if Plaintiff filmed there, he would be arrested.

---

[1] The vehicular gate at the end of the parking lot had signs that stated, "Restricted Access: Information Services Department Employees and Visitors Only – Permit Required—Violators Will Be Towed At Owner's Expense."  No signage was posted at the pedestrian gate next to the building.



45.     In the face of Sergeant Ling's threats, Plaintiff ceased recording and departed the substation—his question still unanswered.

46.     About a week later, on June 2, 2021, Plaintiff Ries filed an Internal Affairs complaint against Sergeant Ling. While talking with SAPD's Internal Affairs, Plaintiff stated that his reason for filing the complaint was to ensure that Sergeant Ling was properly educated on state and federal laws regarding filming in public.

47.     Internal Affairs (IA)—the office in-charge of receiving, processing, and investigating complaints against officers—told Plaintiff that if educating Sergeant Ling was his intention, he needed to speak with Sergeant Ling's chain of command—not them.

48.     Immediately after this IA meeting, Plaintiff returned to the Central Substation to document the signage posted in the areas he was forced to leave under threat of arrest. He wanted definitive proof that the area was an open, public area. As he left the building, Plaintiff noticed a woman driving in the parking lot in front of the Central Substation. After she exited her vehicle and moved to enter the building, Plaintiff, who was standing on the sidewalk leading to the front door of the lobby, asked if she was a city employee. She denied working for Defendant City. Plaintiff provided a friendly warning that he had been told the parking lot was supposedly a secure area restricted to Defendant City's employees only. After she entered the building, this woman brought multiple employees for Defendant City over to the window and pointed Plaintiff out to them.

49.     After trying to provide his friendly warning to the woman, Plaintiff continued on his way to document the No Parking signs at the end of the property. While he filmed them, Sergeant Ling approached Plaintiff. Upon seeing the officer, Plaintiff asked him, "Can you identify yourself, Sergeant Ling?" [During his previous interaction with the officer, Sergeant Ling

had provided Plaintiff with an old badge number, instead of his current badge number. When Plaintiff discovered the discrepancy later, he could never decide if Sergeant Ling had provided the incorrect information intentionally or by accident. Now that Plaintiff knew Sergeant Ling's correct badge number, he wanted to see which badge number the officer would provide.] For some reason, this question enraged Sergeant Ling. Instead of answering it—as he is required to do,[2] he told Plaintiff he could not enter the property or the building. He then demanded Plaintiff, who was standing on a public sidewalk, cease filming and threatened to arrest him. In face of this threat, Plaintiff stopped recording and left the area.

50.      Following this incident, the woman (who was an employee of Defendant City, after all) maliciously filed a report claiming that Plaintiff had entered a secure area and approached and harassed city employees as they tried to enter the building. When Plaintiff obtained the report, he discovered the woman had provided knowingly false statements about Plaintiff's movements to dispatch; Plaintiff never left the sidewalk to enter the areas the woman claimed he entered, nor did he intend for his actions to be harassing. These discrepancies would have been obvious on any surveillance camera footage. Even though this woman, with the intent to deceive, knowingly made a false statement material to a criminal investigation to an employee of a law enforcement agency, upon information and belief Defendant City's officers never charged her with a crime.[3]

---

[2] San Antonio Police Department: General Manual, Section 200 – Rules and Regulation, 3.04(D), effective July 24, 2015. "All members of the department, when called upon to do so by any person, shall, in a courteous manner, give their name and badge number."

[3] TX. Penal Code, Chapter 37, Section 37.08(a): "A person commits an offense if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to: . . . (2) any employee of a law enforcement agency that is authorized by the agency to conduct the investigation and that the actor knows is conducting the investigation. . . ."

51.     After his first incident with Sergeant Ling, Plaintiff tried to obtain Sergeant Ling's BWC footage of that encounter via an Open Records Request made under the Texas Public Information Act.[4]  He was told by Defendant City on June 15th that this record did not exist.

52.     After receiving that notice from Defendant City, Plaintiff immediately went to speak with Sergeant Ling's supervisor.  The receptionist on duty, Edith, refused multiple times to allow him to speak with Sergeant Ling's chain of command.  Edith and a plainclothes officer on desk duty (Badge #1394) claimed, per a supervisory officer named Sergeant Valdez, that Plaintiff could not bring a complaint to Sergeant Ling's supervisor; only to Internal Affairs (IA).  Plaintiff told Edith that he would not leave until someone could tell him when Sergeant Ling's supervisor would be on duty.  In response, the plainclothes officer flashed his gun and badge at Plaintiff.  Intimidated, Plaintiff left.

53.     Plaintiff then sought out IA to make complaints against Sergeant Ling and these Defendant City employees.  IA informed Plaintiff Ries that they had provided this—supposedly non-existent—BWC record to Sergeant Ling's chain of command.  IA then told him to take the matter up with Sergeant Ling's chain of command.  When Plaintiff protested that he had been denied access to speak with Sergeant Ling's supervisor, IA told Plaintiff to go back every day until the supervisor was available.  They would not accept Plaintiff's complaints of official misconduct. Edith and the plainclothes officer later denied denying Plaintiff the right to file his complaint with a supervisory officer.  As far as Plaintiff is aware, neither faced disciplinary action for their actions.

54.     Plaintiff returned on June 16, 2021, and then again on June 17, 2021, to speak with Lieutenant John Zuniga about Sergeant Ling.  On June 17, 2021, Plaintiff was finally able to discuss the matter with Lieutenant Zuniga.

---

[4] TX Govt. Code, Chapter 552.

55.    He explained that the public lobby was in fact an area open to the public.  He also pointed out that the substation had a 411.207 sign posted on an inside wall of the lobby.[5, 6]  (This sign was not posted at the entrance to the building, nor did members of the public need to seek and be granted permission to enter the lobby—just the back areas of the police department behind secured doors.)  Plaintiff explained that the lockers in the lobby were required by Texas law to provide a place for licensed to carry individuals to store their handguns while they were in the restricted area; if guns were not allowed in the lobby, these lockers would not be necessary. Plaintiff further informed Lieutenant Zuniga that this misconception about the public nature of the lobby was repeatedly causing harm.  Plaintiff told the officer about an event he had witnessed during a previous visit to the substation: A victim with a license to carry was refused entrance to the police department lobby to file a police report under threat of arrest, because she was lawfully carrying a handgun in accordance with state laws.

56.    The lobby was a public lobby, Plaintiff stressed to Lieutenant Zuniga.  He then highlighted how equally insane it was that a police officer would justify threatening to arrest a member of the public for filming under the guise of victim rights.  Rape victims should not be forced to spill the horrific and private details of their attack in a public lobby; that is what private interview rooms are for.

57.    Lieutenant Zuniga agreed to look into the matter.

---

[5] TX Govt. Code, Chapter 411, Section 411.207(c): "A law enforcement facility shall prominently display at each entrance to a *nonpublic, secure portion* of the facility a sign that gives notice in both English and Spanish that, under this section, a peace officer may temporarily disarm a license holder when the license holder enters the nonpublic, secure portion of the facility. The sign must appear in contrasting colors with block letters at least one inch in height. The sign shall be displayed in a clearly visible and conspicuous manner."  [Emphasis added.]

[6] TX Govt. Code, Chapter 411, Section 411.207(d)(2): "In this section: (2) '*Nonpublic, secure portion* of a law enforcement facility' means that portion of a law enforcement facility *to which the general public is denied access without express permission* and to which access is granted solely to conduct the official business of the law enforcement agency."  [Emphasis added.]

58.     During this conversation Lieutenant Zuniga informed Plaintiff that he had also received BWC footage from the encounter (which Plaintiff had also been told previously did not exist).  This Lieutenant tried to claim that when Sergeant Ling approached Plaintiff during their second encounter and threatened to arrest Plaintiff if he continued filming, entered the building, or even stepped foot onto the property, that Sergeant Ling had actually intended to tell Plaintiff not to enter the services part of the building—an area *now* marked with restricted signs.

59.     The next day, Lieutenant Zuniga contacted Assistant City Attorney for Defendant City James Kopp to ask about the issues Plaintiff had raised.  Attorney Kopp informed Lieutenant Zuniga that Plaintiff Ries was correct.  **The lobby was a public area, and Plaintiff could film there.**  Further, Attorney Kopp informed Lieutenant Zuniga that the substation should not have posted any illegal gun signs and that the no trespassing signs leading to the night magistrate's court area were unenforceable.

60.     Plaintiff Ries contacted Attorney Kopp to let him know that the unlawful arrest for criminally trespassing was one thing (he would win that case in court), but the signs on the buildings were definitely illegal.  If the city tried to use that signage to justify arresting anyone else, Plaintiff would make certain that Defendant City could not claim it was unaware the signage was unlawful.  Attorney Kopp responded to inform Plaintiff that the City would look at putting up correct—and legal—signs on their buildings.

61.     About three weeks later, Plaintiff drove past the substation to see if the police department had posted signs marking the restricted areas.  When he still did not see any signs, he decided to make a follow-up visit with Lieutenant Zuniga.

62.     On July 14, 2021, Plaintiff visited the Central Substation to speak with Lieutenant Zuniga.  Unfortunately, Lieutenant Zuniga's shift had already ended.  After Plaintiff waited in the

lobby—for thirty minutes—to speak to a patrol shift lieutenant, Defendant Lieutenant Ricky D. Lopez exited the secure area of the facility and approached Plaintiff. Plaintiff greeted Defendant Lopez, and the officer returned his greeting. Defendant Officer then asked Plaintiff if he could help him today. Plaintiff asked Defendant Lopez if he was there to address his complaint. When Defendant Lopez did not seem to know what Plaintiff was talking about, Plaintiff explained that he was at the station to address an issue he had previously raised regarding the illegal and improper signage posted at the substation. Defendant Lopez asked Plaintiff to which signage he was referring. Plaintiff explained the no trespassing signs in the lobby and towing signs in the parking lot were illegal.

63.    At this point two other officers joined Defendant Lopez in flanking Plaintiff, who was sitting in a lobby chair with his back to the wall. Plaintiff asked the officers if they felt threatened by him. (Plaintiff is an older gentleman and a disabled veteran.) The officers reassured Plaintiff that they did not feel threatened; they also did not leave. Satisfied that the officers were good, Plaintiff started to continue.

64.    Defendant Lopez interrupted to ask if he had brought the matter up with the city attorney's office, because that office (under the direction of City Attorney Andrew Segovia) had approved that signage. Plaintiff tried to explain, but Defendant Lopez interrupted again. Speaking over him, Defendant Lopez told Plaintiff that it was no longer a police department issue; he needed to take it to the City Attorney's office. Plaintiff explained it was a police department issue if (TCOLE trained)[7] officers were giving unlawful commands to citizens because they did not understand the intended purpose of posted signage.

---

[7] The Texas Sunset Advisory Commission's Report on the Texas Commission on Law Enforcement (TCOLE) for the 88th Legislature to review determined that TCOLE is "a fragmented, outdated system with inadequate training, lack of statewide standards, and inconsistent accountability." TCOLE was also described as being "fundamentally broken."

65.     Defendant Lopez wanted to know if Plaintiff understood the signs.  Plaintiff assured Defendant Lopez he understood the signs perfectly, just like he understood the sign posted out front which informed him he is allowed to carry a firearm inside the lobby, but Defendant Lopez's officers still told Plaintiff Ries that they would arrest him.  Defendant Lopez pointed to the 411.207 sign on the wall.  As Plaintiff tried to explain the purpose of that sign, Defendant Lopez interrupted again, asking Plaintiff twice if he had a firearm with him.  Plaintiff Ries tried to ask Defendant Lopez if he understood what that sign meant, but Defendant Lopez again interrupted, "I'm asking you a question. Do you have a firearm with you?"

66.     When Defendant Lopez continued asking if he had a firearm with him, Plaintiff asked Defendant Lopez if he suspected he did.  Defendant Lopez pointed out that Plaintiff had stated that officers outside had told Plaintiff they would arrest him for bringing a firearm into the lobby.  Plaintiff responded that the same officers had also threatened to arrest him if he filmed in the lobby—and he was filming Defendant Lopez as they spoke.  Defendant Lopez, believing himself clever, told Plaintiff the matter obviously was a concern to him.  He again asked if Plaintiff had a firearm on him.  Plaintiff agreed to answer the question, out of concern for the other police officers standing around him: He did not have a firearm on him.  Defendant Lopez thanked him for answering the question.

67.     Plaintiff again tried to address his concern that officers tell people they would arrest them for bringing a firearm into the public lobby of the police station.  Defendant Lopez tried to claim that the lobby was a prohibited area based on posted signage.  The sign in question read as follows (in English and in Spanish): "**Security Area—No Weapons Allowed: Licensed Handgun Holders May Be Temporarily Disarmed When Entering the Non-public, Secure Area of This Facility under Authority of Texas Government Code Section 411.207**."

68.     Plaintiff Ries tried to explain that the 411.207 sign states that an individual can bring a firearm into the *public* lobby.[8]  Defendant Lopez told Plaintiff that if he had a problem with the posted signage that he should speak with the city attorney and pointed in the direction of the city attorney's office.  Plaintiff, who had already spoken with the city attorney's office, tried to explain, again, that the problem was not with the sign, but, rather, with officers who do not understand what the sign means.  Defendant Lopez, ignoring Plaintiff's attempts to educate him in an area where he clearly had been inadequately trained, tried to direct Plaintiff Ries out of his lobby and off to the city attorney and public safety headquarters' offices.

69.     When Plaintiff tried to continue the conversation, Defendant Lopez interrupted him to tell him that the conversation was done.  Defendant Lopez then walked away.  Frustrated, Plaintiff told the departing lieutenant, that they were done because Defendant Lopez was "an idiot."  Plaintiff told Defendant Lopez that if he was going to tell him that it was illegal for a license holder to carry a firearm into the public lobby, then he had a firearm on him.  (Plaintiff's point was that, if Defendant Officers can lie to law abiding citizens when threatening to unlawfully arrest them, then he could lie, too.)  Plaintiff then moved to exit the public lobby.  At this point, under Defendant Lopez's orders, Defendant Officers restrained Plaintiff, placing him under arrest.  Defendant Lopez ordered Plaintiff's arrest in retaliation for calling him an idiot, but justified the arrest on the basis that Plaintiff was aware of the posted 411.207 sign.

---

[8] TX. Govt. Code, Section 411.207(c): "A law enforcement facility shall prominently display at each *entrance* to a nonpublic, secure portion of the facility a sign that gives notice . . . that, under this section a peace officer may temporarily disarm a license holder when the license holder enters the *nonpublic, secure portion* of the facility" [emphasis added].  TX. Govt. Code, Section 411.207(d)(2): "'Nonpublic, secure portion of a law enforcement facility' means that portion of a law enforcement facility to which the general public is denied access without express permission and to which access is granted solely to conduct the official business of the law enforcement agency."  This signage only prohibits license holders from carrying a handgun into a restricted section of the police department— not the public lobby.

70.    Defendant Officers handcuffed Plaintiff and turned off his phone which was recording the situation; a concealed camera he was wearing on his person remained recording. Only after Plaintiff's recording was ended, did Defendant Officers search Plaintiff for the weapon he was allegedly carrying.  As the officers patted Plaintiff down, he told them that he did not consent to be searched and asked the officers to not open his backpack.  The officers felt the contents of his bag without zipping it open, before ultimately determining that Plaintiff was not carrying a firearm.  [Plaintiff had a recording device in his backpack that he did not want the officers to see out of fear that they would alter the recording.]  When Defendant Lopez asked Plaintiff why he would lie to the police about carrying a firearm, Plaintiff Ries asked why Defendant Lopez would lie to him about the restrictions included in the 411.207 sign.

71.    At this point, Defendant Officers released Plaintiff.  Defendant Lopez asked Plaintiff to continue facing away from him.  Plaintiff agreed to comply with his orders.  Defendant Lopez instructed Plaintiff to leave the premises as the officers could not help him and threatened to arrest Plaintiff if he did not leave.  Plaintiff again tried to ask Defendant Lopez about the department's erroneous policy regarding the posted signage, but Defendant Lopez only told Plaintiff to leave.  Plaintiff, irate at this point at not being heard when he was trying to address the substation's unlawful policy of threatening to arrest and of arresting licensed individuals legally carrying per state laws, agreed to leave but also told Defendant Lopez that *he* needed to leave as he was "a lying, piece of shit."  Plaintiff then exited the building.

72.    Outside, Plaintiff recorded signage prohibiting guns inside city buildings unless specifically permitted under Texas state law—such as carrying a handgun with a license to carry (LTC)—while he calmed down.



73.    After standing outside the door's building to record his opinions on the matter of officers unlawfully threatening to arrest him based on a faulty understanding of posted signage, Plaintiff reentered the building for the sole purpose of asking for a copy of Defendant Lopez's CTW in writing so that Plaintiff could understand the exact terms and duration of the trespass. Plaintiff spoke with the receptionist with whom he was already on a first name basis from prior visits.  She asked for a phone number for Plaintiff in case Defendant Lopez could not be reached; Plaintiff instructed her to direct the officers to obtain that information from the Southwest Texas Fusion Center (SWTFC), a collaborative agency managed by SAPD, who already had his contact information.  He also told her to obtain his date of birth from the same.  He then apologized to the receptionist for his frustration.

74.    The receptionist told Plaintiff to wait, so he did.  Then she told Plaintiff that Defendant Lopez was on a call.  Plaintiff assured the receptionist that he would wait until Defendant Lopez ended his call.  At this point, the receptionist admitted that Defendant Lopez was no longer at the substation.  Plaintiff told the receptionist that he needed the CTW in writing, or he would not consider it valid.  [Plaintiff wanted proof that the CTW was actually in the system this time, along with knowledge of its exact terms and duration.]  The receptionist asked Plaintiff

to sit down and wait.  As he was sitting peacefully and waiting, six officers---at the direction of Defendant Lopez—arrived and arrested him for criminally trespassing.

75.    Defendant Officers charged Plaintiff with "Criminal Trespass – Private Property." Plaintiff appeared before a magistrate judge that same day, and his bond was set at $750.00.  Two days later, on Friday, July 16, 2021, Plaintiff was appointed a defense attorney, and the paperwork for this appointment was filed on Monday, July 19, 2021.  That same date, Plaintiff was able to pay his bond and secure his release from jail—five days after his arrest for trespassing on "private property" for being in the public lobby of a city-owned-and-run police department after calling Defendant Lopez an idiot.

76.    The prosecutors tried multiple times to convince Plaintiff to plead guilty.  When all those attempts failed and after Plaintiff reached out to Assistant City Attorney James Kopp for help, they finally dismissed the charge (Rejected – Declination) on March 3, 2022, seven-and-a-half months post-incident.  Because they were prosecuting the charge, Defendants refused to dismiss the criminal trespass for months; then, because the charge was dismissed, Plaintiff was denied his day in court in front of a jury of his peers.  At the time of the dismissal, Plaintiff was informed that the Criminal Trespass warning would be removed as well since the criminal case had finally been resolved.

77.    After Plaintiff was released from jail, he started working with Captain Garcia, who assigned Sergeant Roberts to work with him, and Attorney James Kopp to fix the multitudinous issues with the posted signage at 515 S. Frio.

78.    On one occasion, Assistant City Attorney James Kopp asked Plaintiff to meet him at the substation.  Plaintiff agreed, but he told the attorney he had to make a stop to give his sister

bail money, in case another officer decided to arrest him for being on the premises—even though an attorney for Defendant City had requested his presence.

79.    Eventually, Defendant City took down the unlawful signs.

80.    When Plaintiff drove by the next day, the signs had been put right back up. Plaintiff called Attorney Kopp and informed him that the signs were posted. The attorney told Plaintiff that the signs had been taken down the day before. Plaintiff agreed with him, then delivered the unfortunate news that the substation had already re-posted the illegal signage.

81.    In September of that year, Plaintiff broke his left humerus. He was prescribed hydrocodone for the injury. At the time, Plaintiff was living at Haven for Hope. He was required to leave his prescription with his medication at the center; however, he wanted to take a couple pills with him whenever he was out and about, in case he needed one. To avoid any problems, he took a picture of the prescription so he could prove that he had been legally prescribed the medication.

82.    That month, while he was having a conversation with a police officer, he was told that he needed to keep the physical prescription on him since hydrocodone is a Schedule II drug.

83.    Seeking clarification, on September 25, 2022, Plaintiff headed to the closest police substation, which happened to be the Central Substation at 515 S. Frio. He intended to speak with a supervisory officer there to confirm that a photo of his prescription was insufficient for him to take his medication out and about with him.

84.    Instead, Plaintiff was arrested for criminally trespassing. Although Plaintiff was not aware that the criminal trespass had not expired or been removed—as it should have been—he was taken to jail. Plaintiff appeared before a magistrate and his bond was set at $1,000.00.

Plaintiff was released on bond on September 26, 2022. Defendant City's officers also used this arrest as an excuse to submit a report to the court claiming that Plaintiff had violated his bond.

85.     Following this arrest, Plaintiff made multiple requests to have the criminal trespass warning removed from the system after it had deceitfully and unlawfully been re-added to the system. Finally, Defendant City's officer, Captain Garcia had Sergeant Robarts tell Plaintiff that the only one who could remove the criminal trespass early, before its July 14, 2022, expiration date, was Defendant Lieutenant Lopez, but he was refusing to do so. His other option was to spend thousands of dollars to file a lawsuit.

86.     Plaintiff called Attorney Kopp and left a voicemail telling him that petty actions like re-adding the criminal trespass to the database were the sorts of things that cost the city a lawsuit.

87.     On October 5, 2022, Plaintiff walked out of his sister's apartment to discover a heavy police presence in the apartment parking lot. Plaintiff started filming, as was his practice. While he was filming, Defendant Officer Valero (Badge #1252) approached Plaintiff and told him he had to get back. Plaintiff asked the officer where he wanted him to stand. The officer only replied that he had to go back. After Plaintiff asked several times, the officer finally clarified that he wanted Plaintiff to move back past the gate. Plaintiff was already behind the only gate in the area, a gate which incidentally, was located between Plaintiff and the officer. When a confused Plaintiff tried to confirm that he was not okay standing where he was, the officer moved to arrest him for Interfering with Public Duties. Defendant Valero did not ask any other individuals in the area to move back from the scene even though there were individuals who were not filming sitting closer; he did not detain them either. KSAT was filming closer than Plaintiff was standing; Defendant Valero did not require them to move away or detain them. Defendant Valero only

approached and arrested Plaintiff—within forty seconds from when Plaintiff began filming—because he was a private citizen filming police officers.

88.     Plaintiff was handcuffed and placed in the back of a patrol vehicle.  Despite his broken humerus, Defendant Officers would not allow him to have his handcuffs in front, initially provide him double-handcuffs, or even lock the handcuffs to keep them from tightening further. When Plaintiff asked for a supervisor to make scene, he was ignored.

89.     Plaintiff was taken to jail, taken in front of the magistrate, and released October 6, 2022, on a $500 bond.

90.     The next day, Defendant City's officers used this arrest as an excuse to submit two reports to the court claiming that Plaintiff had violated his prior bonds.  A warrant was issued for Plaintiffs arrest on October 10, 2022, and Plaintiff's two $1,000 bonds were both increased to $2,000.

91.     Plaintiff was arrested on both warrants on Wednesday, October 12, 2022, and Defendant City towed his vehicle.

92.     Plaintiff was not able to secure his release from jail on the increased bond amounts until October 15, 2022, three days later. When he was finally released from jail, he discovered that a Defendant Officer had placed his belt in Plaintiff's vehicle (which had been towed) instead of logging it in with his other property at the jail.  Without that belt, Plaintiff was unable to keep his pants from falling down.  Plaintiff ended up walking 12 miles to the impound lot to get his vehicle out in his underwear only to discover that they had lost his car keys.  Further, his medication—a Class 2 Substance—and his firearm had been left in his vehicle which was unlocked in the city-run tow yard.  The tow yard was unable to locate Plaintiff's keys, and he had to pay to have his vehicle re-keyed.

93.     Following these events, Plaintiff worked with Assistant City Attorney Kopp to get the unlawful signage taken down (again).  Plaintiff hoped Defendant City had finally stopped placing its citizens and officers in an untenable situation.

94.     Then in November, Plaintiff noticed that Defendant City had posted new signage. This signage, while different, also violated state laws.[9]

95.     Plaintiff started the exhausting process all over again.  He went to different police substations, spoke with city council members, and reached out repeatedly to Attorney Kopp.

96.     On February 13, 2023, while re-visiting SAPD substations to see if they still had the illegal signage posted, Plaintiff visited the South Substation located at 711 W. Mayfield Boulevard, San Antonio, Texas 78211.  As Plaintiff approached the substation, he discovered, still clearly posted on the door, signage banning rifle, shotguns, and knives on the property.  Plaintiff



---

[9] The Texas Local Government Code 229.001(a)(1) prohibits a municipality from regulating the wearing or carrying of firearms and knives, while Section 229.001(a-1) voids any "ordinance, resolution, rule, or policy adopted or enforced by a municipality, or any official action . . . taken by an employee or agent of a municipality in violation of this section." Only the Texas legislature has the right to regulate the wearing or carrying of knives and firearms in Texas.

Ries entered the substation, while filming as is his custom, to speak with someone about the unlawful sign.

97.      After waiting in the public lobby for a while, Defendant Sergeant D. Contreras (Badge #3079) entered the lobby and, after a gesture from the receptionist, approached Plaintiff, asking if he wanted to speak to a sergeant.  Plaintiff confirmed that he had been hoping to speak with someone in the chain of command, before introducing himself to Defendant Contreras.  After confirming that Defendant Contreras had not heard of him, Plaintiff introduced himself as "rights activist."  Plaintiff then informed Defendant Contreras, as a professional courtesy, that he was armed, so that Defendant Contreras could be situationally aware.  Defendant Contreras asked Plaintiff to confirm that he was armed, and then told him that he would need to go outside of the building.  When Plaintiff asked why he would need to go outside, Defendant Contreras directed him to the 411.207 sign posted on the wall.  Plaintiff told Defendant Contreras, "Nah," but that he would go outside and would not argue.

98.      Defendant Contreras led the way outside with Plaintiff following.   While they walked, Plaintiff tried to explain that the non-public, secure area was past the substation's secure doors.  As Plaintiff tried to explain the wording of the sign—including the fact that Defendant City had re-worded it again because officers found it to be confusing—Defendant Contreras interrupted Plaintiff to ask him if he had been at the substation a week ago.  Plaintiff agreed that he came around quite frequently.    When Defendant Contreras pushed, Plaintiff agreed that he had been there just last week or the week before, and that, yes, he had seen the sign on the door before.    Defendant



Contreras asked Plaintiff if he was aware that an individual could not enter the property with a <u>rifle</u>, <u>shotgun</u>, or <u>knife</u>.  Plaintiff told Defendant Contreras that he had read the sign correctly. Defendant Contreras then tried to claim that Plaintiff had done just that—for entering the public substation with a *handgun*.  Plaintiff asked what the crime was, and Defendant Contreras told him it was a city ordinance.[10]

99.    When Plaintiff encouraged Defendant Contreras to contact his superior, Defendant Contreras argued that Defendant City would not put the sign (the one that bans rifles, shotguns, or knives) on the door to the substation, unless they had a city ordinance to back it up.

---

[10] Defendant City's *Code of Civil and Criminal Ordinances*, Section 21-157 (adopted on 12/21/1995 and not updated since to comply with state laws) does indeed prohibit the carrying or possessing of weapons on city-owned premises:

"Sec. 21-157. – Carrying of weapons, including concealed handguns, on city-owned premises prohibited; posting of notice

    (a)   It is the intent of the city council to prohibit any person other than a commissioned security officer employed by the city and licensed peace officers from carrying or possessing weapons, including concealed handguns on city-owned premises, including city-owned buildings, parking garages, lots, and other parking arears but excluding city-owned or operated public parks, streets and sidewalks.

    (b)   It is the intent of the city council that the term weapon shall include a firearm, handgun, club, illegal knife, knife, and any prohibited weapon listed in Texas Penal Code Section 46.05(a) and have the same meaning as said items are defined in Section 46.01, Texas Penal Code.

    (c)   The city council directs the city manage, or his designee to post the appropriate signs and such other notice, in accordance with Section 30.05 of the Texas Penal Code (the Criminal Trespass Law), to carry out the city council's above-stated intent.

    (d)   The city manager is authorized to take all steps reasonable and necessary to deny entry or continued presence on city-owned premises to all such person possessing weapons including concealed handguns, including prosecution of such violators for the offense of criminal trespass."

This ordinance is contrary to Texas Local Government Code 229.001(a)(1).  As such, Texas Local Government Code 229.001(a-1) voids any part of this policy applying to the weapons listed out in Section 229.001(a)(1): "firearms, air guns, knives, ammunition, or firearm or air gun supplies or accessories."

100.    Defendant Contreras then told Plaintiff Ries that he would call an officer, and Plaintiff Ries would be arrested for violating that ordinance. Plaintiff asked Defendant Contreras to confirm that he was being arrested for the sign on the door. Defendant Contreras confirmed, before pointing out that Plaintiff had been at the property before and had seen the sign. Plaintiff Contreras agreed that he had seen the sign (a sign that does not mention handguns at all, let alone handguns carried in accordance with state law).



101.    Defendant Contreras informed Plaintiff that he had the whole thing filmed on his body camera: that Plaintiff saw the sign and still did that. Plaintiff asked Defendant Contreras what he was accusing Plaintiff of doing. Instead of answering, Defendant Contreras radioed dispatch to request an officer at the substation for an arrest. Plaintiff tried asking again, wanting to know what crime Defendant Contreras was accusing him of committing, since he was obviously detained. Defendant Contreras finished his conversation with dispatch first. After Plaintiff asked again to know the crime he was being accused of committing, Defendant Contreras told him that he had seen the sign.

102.    Plaintiff tried to explain that the sign was not a legal sign (it conflicts with state laws on the carrying and wearing of firearms and knives).  Defendant Contreras told Plaintiff that he could try to prove that in court.  When Plaintiff again tried to ask what crime for which he was being arrested, Defendant Contreras merely told him "City Ordinance."  When Plaintiff asked for the ordinance number, Defendant Contreras told Plaintiff the ordinance Defendant City had made that said that Plaintiff could not enter that place with a weapon.



103.    Plaintiff tried to argue that there was no ordinance, and Defendant Contreras tried to argue that Defendant City would not post that sign without one.  Plaintiff told Defendant Contreras that that was exactly why he had come out there to talk with him.  Defendant Contreras told Plaintiff that he did not put that ordinance there; he just follows what he is told to do.  Plaintiff asked Defendant Contreras if Defendant City told their officers to arrest anyone who brings a weapon into the building.  Defendant Contreras claimed that that was the reason Defendant City had the sign posted.

104.    Plaintiff informed Defendant Contreras that he was not a threat to him; Defendant Contreras agreed.  Plaintiff asked the sergeant if he would like to disarm him, now that he was detained.  Defendant Contreras told Plaintiff no, unless he was threatening to do something to him.  Plaintiff responded, "Absolutely not. Absolutely not."  Defendant Contreras responded that he did not feel threatened either, before reiterating that Plaintiff had violated the sign.  Plaintiff read the sign out loud, before reminding Defendant Contreras of the sign inside which discusses disarming

if one enters the *secure* area.  Plaintiff tried to discuss the measures Defendant City had taken to re-word the sign, but Defendant Contreras objected that he did not re-word or post the current signage.  Plaintiff agreed that Defendant City had re-worded the signs "to say 'entering a non-public portion of this building.'"  The lobby is a public lobby, and an individual can enter the lobby with a firearm.  That is not against the law.  Defendant Contreras asked why Defendant City would post the sign on the door, then.  Plaintiff explained that the sign was what he was there to talk to him about.

105.    Defendant Contreras, without considering Plaintiff's arguments, informed Plaintiff that he did not know, before proceeding to explain Defendant City's policy regarding requiring individuals to disarm before entering SAPD substations—contrary to state law.  When pushed, Defendant Contreras could not provide the City Ordinance number (The number is Section 21-157.).

106.    Defendant Contreras agreed with Plaintiff that he was detained but would not allow him to light a cigarette—he would consider that—or doing stuff other than just standing there—a threat, and he would need to handcuff him.

107.    Plaintiff tried to inform Defendant Contreras that he was trying to help keep Defendant City from being sued.  Defendant Contreras continued to espouse Defendant City's policy, even when Plaintiff asked if the TCOLE refresher course, following the passage of constitutional carry, had informed him that individuals could enter a police lobby with a firearm.  Defendant Contreras denied learning that.

108.    Defendant Contreras asked Plaintiff if he had arrived in a car—because he could put stuff in there; he also could call someone to pick up his vehicle, so they did not need to tow it following his arrest.  Plaintiff declined to confirm whether he had a vehicle parked nearby,

although he hoped that when the officer arrived and failed to find a penal code, he and Sergeant Contreras could talk after he was released.

109.    The officer arrived shortly after.  Defendant Contreras and Officer A. Coronado (Badge #554) handcuffed a compliant Plaintiff.  Plaintiff also informed them that his handgun was on his front, left side.  As Officer Coronado walked Plaintiff to his car, Defendant Contreras turned off Plaintiff's camera.

110.    As he had been arrested, Plaintiff was searched.  His weapon was confiscated, and his possessions were removed from his person.  Defendant City's officers then placed him in the back of Officer Coronado's vehicle.  Plaintiff sat in the backseat of that vehicle for twenty-five to thirty minutes.  During that time, he struggled with rampant anxiety.

111.    While he waited, Defendant Sergeant Contreras made a phone call.  Following this conversation, Defendant Contreras immediately released Plaintiff.

112.    Once he was free, Plaintiff started filming again with his camera.  He then asked Defendant Contreras to confirm that he was no longer under arrest.  Once that was confirmed, Plaintiff asked Defendant Contreras if he was able to confirm that there was no city ordinance [as there should not be one].  Defendant Contreras dodged answering the question.    Instead, he informed  Plaintiff that he had talked to Defendant Lieutenant Lopez at the Central Substation, who said he had "dealt with" Plaintiff.

113.    Plaintiff agreed; Defendant Lopez had made the last unlawful arrest.

114.    Defendant Contreras admitted that he asked Defendant Lopez for the information on the ordinance, however, Defendant Lopez told Defendant Contreras the Plaintiff Ries was correct and that those signs were supposed to *eventually* be taken down.  Defendant Lopez did not believe that Defendant City had provided a specific order to the police captains to take down the signs.  Defendant Contreras conveyed that until that happened, he could only abide by the posted signage, because he was not in charge.  A Lieutenant and a Captain still ranked higher than him.

115.    Defendant Contreras also told Plaintiff that Defendant Lopez had told him that he had checked Plaintiff out and that he only had a condition of bond—Plaintiff is not allowed to approach Lopez and the SAPD substation at 515 S. Frio, the 'victims' involved.  Plaintiff explained the reason behind the condition—Defendant Lopez did not like Plaintiff cussing at him when he unlawfully arrested him.  Defendant Contreras denied knowing anything about that incident—even after just getting off the phone with Defendant Lopez—but confirmed that Plaintiff was not trespassed generally from federal or government buildings.

116.    After discussing the situation with Defendant Lopez, Defendant Contreras informed Plaintiff he would try to get Captain Zuniga, his captain, to order the removal of the substation's signs, similar to how the north substation's captain removed the signs at his building after speaking with Plaintiff.  Plaintiff thanked Defendant Contreras for reaching out to someone higher in the chain of command to request guidance on the situation.

117.    Defendant Contreras, who had unlawfully arrested Plaintiff over an unlawful city ordinance, then tried to claim, "No harm; no foul," because Plaintiff was not being charged with a crime.  He also tried to claim it was not *really* an arrest, more of a detention.

118.    At this point, a disturbance down the street interrupted the conversation.  Defendant Officers, who needed to check out the disturbance, quickly returned Plaintiff's possessions, including placing his gun in the trunk of his vehicle, and he was allowed to leave.

119.    Following this incident, Defendant Contreras, who had arrested Plaintiff, did not complete a police report.  Instead, he had the patrol officer, Officer Coronado, write the report.  Despite Defendant Contreras's verbal attempts to downplay the arrest as merely a detention, Officer Coronado correctly reported that Plaintiff had been arrested.  Ironically, Defendant City's Police Department now claims Plaintiff was only detained.

120.    On February 15, 2023, Assistant City Attorney James Kopp reached out to Plaintiff asking for two weeks to resolve the issue regarding the signage.  Plaintiff told him that he found it funny that he was asking for two weeks to resolve the issue, when he had a court hearing in about that time for his latest criminal trespass charge, for an issue Attorney Kopp claimed had been resolved the last time Plaintiff beat that charge.  Attorney Kopp reached out to prosecutors, and they dismissed the trespassing charge the next day.

121.    On March 3, 2023, Plaintiff reached back out to Assistant City Attorney James Kopp.  He started the discussion on the removal of the unlawful signage.  Defendant City's attorney told Plaintiff that Defendant City's policymakers had decided to move the signs from the exterior doors to the interior doors, leading to the restricted areas of the police stations.  Plaintiff asked the attorney about the signs being posted in other city buildings.  Defendant City's officers were threatening to arrest individuals for entering other public areas while armed.  Attorney Kopp told Plaintiff that Defendant City's officers should not be threatening to arrest individuals and that he would work on taking care of that.

122.    Plaintiff told the attorney that he had communicated with commanding officers at all of the police departments to request that they educate their officers on the signage—and he was still arrested by Defendant Contreras for having a handgun in a public lobby.  Attorney Kopp promised to reach back out to the police administration to let them know that a person can carry a handgun into the public area of any city building, before suggesting perhaps it was just a training issue.

123.    Plaintiff then informed the Assistant City Attorney that his criminal trespass from 515 S. Frio had been re-added to the system—again.  Attorney Kopp's response? "G*dd*mm*t." Attorney Kopp promised that the warning would be removed.  Attorney Kopp admitted that if someone was behaving very disruptively at a library, they might criminally trespass there. "But a police station? You cannot tell a citizen they cannot come into a police station."  They might arrest someone for criminal trespassing if he or she was committing disorderly conduct and did not leave when asked, but "you can't give a blanket criminal trespass notice at a police station.  You just can't."

124.    Plaintiff filed an in-person IA report with Defendant City's officers Sergeant J. Reyna (Badge #3291) and Sergeant J. Angell (Badge #3134).  Defendant City's officers would not let him make his report in their office space because he did not have his ID with him.  Additionally, they only permitted him to make a verbal complaint.  Defendant City treats verbal complaints as being informational only.  Plaintiff asked to sign a statement, but Defendant City's IA officers refused to let him.  They asked him to verbally swear to the accuracy of his statement but would not let him complete a written statement.[11]

---

[11] San Antonio Police Department: General Manual, Procedure 303 – Disciplinary Procedures, .10(A)(2). "Complainants shall be advised the Department may not implement formal disciplinary actions against sworn members without signed, sworn complaints, although oral complaints may receive supervisory review appropriate to the nature or severity of the allegations. . . ."

125.     Following this statement, a Defendant City officer Sergeant Ross told Plaintiff he had a CTW for 515 S. Frio which would expire on March 12, 2023.

126.     On March 1, 2023, Plaintiff submitted an open records request pursuant to the Texas Public Information Act as outlined in the Texas Government Code, Chapter 552, requesting all current criminal trespass warnings still effective at 515 S. Frio.  On March 16, 2023, he received a response from Defendant City.  In response to his request, Defendant City claimed that they had no responsive documents.

127.     Accordingly, on March 22, 2023, Plaintiff returned to 515 S. Frio.  While there, an officer for Defendant City informed Plaintiff that he still had a CTW for the premises and asked him to wait outside for a supervisor.  Plaintiff waited the fifteen minutes, but a supervisor never showed.  He called Attorney Kopp and left a voicemail, before he gave up and left the property.

128.     On March 23, 2023, Internal Affairs agreed to let Plaintiff return to sign a formal complaint.  Plaintiff completed his perjury statement in front of Sergeant Gabriel Rosas (Badge #3122).

129.     Plaintiff has received no notice that Defendant City is in the process of investigating his complaint.  Nor has he received notice of any result from an investigation into his complaint.  Upon information and belief, Defendant City has refused to investigate Plaintiff's Official Oppression complaint.

130.     Plaintiff has spent over 35 days in jail for wrongful arrests or arrests based on falsified information.  Plaintiff has been charged with five separate charges—all of which have been dismissed or rejected by the Bexar County District Attorney's Office.  Plaintiff has had to spend money on seven separate occasions for jail bonds or on increases in existing jail bonds.

131.     Why?

132.    One, because Plaintiff tries to hold Defendant City—and its officers—accountable to Texas state laws, and because Plaintiff criticizes Defendant City—and its officers—for violating laws, for oppressing lawful citizens, and for pursuing malicious and retaliatory charges against him based on falsified information.

133.    Two, because Defendant City, its policymakers, and their City Attorney Andrew Segovia have a policy of not removing ordinances that are or could be contrary to state law from their *Code of Civil and Criminal Ordinances* until they are challenged.[12]

134.    Plaintiff Ries has and continues to challenge the City of San Antonio's *Code of Civil and Criminal Ordinances*, Section 21-157.  Defendant City, its policymakers, its officers, and Defendant Officers have responded and continue to respond by violating Plaintiff's First, Second, and Fourth Amendment rights.

135.    Plaintiff has been harmed as a result.

---

[12] "City Attorney: San Antonio won't take ordinances off the books in face of sweeping preemption bill," Garrett Brnger, KSAT.com, https://www.ksat.com/news/local/2023/05/25/city-attorney-san-antonio-wont-take-ordinances-off-the-books-in-face-of-sweeping-preemption-bill/, accessed on June 7, 2023.

## CLAIMS AGAINST THE CITY OF SAN ANTONIO

### COUNT I
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Violation of First Amendment Rights)

136.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

137.    Under color of state law and through a municipal policy or custom, Defendants deprived and continue to deprive Plaintiff of his rights to freedom of expression, including through expressive conduct, to peaceably assemble, and to freely petition for redress of grievances under the First Amendment.

138.    "When public officials are given the power to deny use of a forum in advance of actual expression or association, the danger of prior restraints exists." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004). "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system." *Id*. (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)).  "It is thus clearly established that if public officials abuse their discretionary power to deny in advance use of a forum for First Amendment—protected expression without enacting proper safeguards, this constitutes an impermissible prior restraint." *Id*.

139.    The City's never-ending ban issued to Plaintiff from the Defendant Lopez, on behalf of the City of San Antonio imposes a prior restraint on the exercise of Plaintiff's First Amendment rights, and the ban is not narrowly tailored to serve any significant governmental interest and fails to leave open ample alternative channels of communicating Plaintiff's messages.

140.    Defendants' invocation of the city's policy to enforce a ban of Plaintiff from protesting or performing business at traditional public forums at any public city building demonstrates that the policy is not content-neutral.  Rather, in application, the policy permits and encourages official discrimination among Plaintiff based on the content of his speech and does so without being narrowly tailored to advance a compelling governmental interest.

141.    On July 14, 2021, Plaintiff was filming Defendant Lopez from a public lobby at an SAPD substation.  Plaintiff was lodging a complaint concerning the posted signage that was inconsistent with State law.  After Defendant Lopez refused to engage in any civil conversation with Plaintiff, Plaintiff called him an idiot.  Defendant Lopez, on behalf of the City and with authority conveyed to him by Chief McManus and other policymakers, issued a criminal trespass warning to Plaintiff banning him from all city property for any purpose.

142.    When Plaintiff later attempted to get a copy of the trespass notice, Defendant Lopez, with authority of City's policymakers, had Plaintiff arrested for violating the trespass warning.

143.    When this charge was dismissed, Plaintiff was informed that the trespass warning would be removed.  With the consent of Chief McManus, Defendant Lopez refused to remove the warning.

144.    When the warning was set to expire, Defendant Lopez, with the consent of Chief McManus, had the warning reissued without notice to Plaintiff.

145.    The criminal trespass warning imposed a complete, indefinite ban against Plaintiff from engaging in any activity from the public spaces of the police department and any city property.

146.    In direct response to Plaintiff's speech, because of that speech, and to prevent further speech, Defendant Lopez, with delegated authority from the City of San Antonio policymakers, issued the criminal trespass notice to Plaintiff with the intent of permanently banning him from city property.  This trespass was enforced by all City officials and employees and used as a pretext for the issuance of arrests and criminal charges.

147.    This complete ban amounts to an infringement on Mr. Ries' First Amendment right to film government officials performing public duties, as well as his First Amendment right to file formal complaints pertaining to unlawful city policy, and to file complaints against police officers.

148.    Defendants' baseless exclusion of Plaintiff was not content-neutral and fails every aspect of the strict scrutiny to which it is subject.

149.    Defendant City's policy of issuing, re-issuing, and enforcing the criminal trespass notice against Plaintiff is unconstitutionally overbroad and vague, delegating to a wide range of city employees effectively unrestrained discretionary authority to ban Plaintiff permanently, merely because a city employee does not like his First Amendment activity.

150.    As Plaintiff's experiences show, the city's criminal trespass notice policy sweeps within it an unreasonably broad range of protected First Amendment activity that, despite enjoying heightened protection under federal law, could nonetheless be subjectively viewed as criminal by city employees lacking any further guidance on implementation of the policy.

151.    Further, the threat of being banned, arrested, jailed, and charged imposes a significant chilling effect on an individual of ordinary firmness who wishes to exercise their First Amendment rights of free expression and assembly but reasonably fears significant interference with their ability to access and interface with the local police department should they run afoul of

the vague prohibitions of city policy, as interpreted by city employees delegated an immense degree of discretion.

152.    The unconstitutional overbreadth and vagueness of the City's policy of issuing and enforcing the complete ban, coupled with its chilling effect on First Amendment rights, renders the policy facially unconstitutional and invalid in all applications.

153.    The criminal trespass warning bars Plaintiff from speaking in a traditional public form.

154.    The criminal trespass warning does not have any expiration date and is still in effect today.

155.    Banning Plaintiff from going to any city location for any purpose, including all expressive purposes, based on Plaintiff engaging in nonviolent, nonthreatening, at most minimally disruptive expressive activity cannot possibly be narrowly tailored to satisfy any compelling government interest.

**COUNT II**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(First Amendment - Official Retaliation)**

156.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

157.    Defendants' actions to completely and permanently ban Plaintiff from participating in protests and other expressive conduct at the police station, City Hall, or other public spaces owned by the City, constitutes unlawful official retaliation against Plaintiff for his exercise of his First Amendment rights to film police, file complaints, to engage in free expression, peaceable assembly, and petitioning for the redress of grievances.

158.    The City's retaliatory actions include but are not limited to: (1) issuing and re-

issuing criminal trespass notices to Plaintiff for simply exercising his First Amendment rights; (2) imposing and threatening enforcement, through criminal trespass notices, seizures, complete bans, and criminal prosecution; and (3) applying its policy of only issuing criminal trespass notices to Plaintiff to completely silence him and close all channels of communication.

159.    The City, its officials, and its employees are without probable cause or any basis to issue criminal trespass warnings, or to enforce them.  The only reason to do so is to infringe on Plaintiff's First Amendment activity.

## COUNT III
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Violation of Second and Fourteenth Amendments)

160.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

161.    On February 13, 2023, Plaintiff's clearly established Second and Fourteenth Amendment rights were violated by the City of San Antonio after Defendant Contreras, with delegated authority from Chief McManus, City Council, and the City Manager, directed that Plaintiff be arrested for violating City ordinance that was inconsistent with state and federal law.

162.    This arrest resulted in Plaintiff being unlawfully disarmed.

163.    Defendant City knew that its signs—and policy of enforcing the weapons ban from public lobbies—was unlawful but it kept the signs posted and continued to enforce them.  It was foreseeable to policymakers that by keeping the signage posted, and continuing to enforce a weapons ban, that their employees were likely to violate Plaintiff's rights.

164.    The signage and enforcement violated Plaintiff's rights and he was harmed as a result.

165.    The City of San Antonio's ban against the carrying and displaying of firearms in public lobbies of municipal buildings not only violates state law, but it interferes with Plaintiff's ordinary self-defense needs by preventing him from exercising his Second Amendment right to keep and bear arms in public for self defense.

166.    The Second Amendment's operative clause—"the right of the people to keep and bear Arms, shall not be infringed"—encompasses Plaintiff's right to carry in public.

167.    The Texas Constitution guarantees every Texan "the right to keep and bear arms in the lawful defense of himself of the State" and gives the Texas legislature "the power, by law, to regulate the wearing of arms . . . to prevent crime." TEX. CONST. ART. 1, § 23.

168.    Section 229.001 of the Local Government Code prohibits the City of San Antonio from attempting to regulate the carrying of a firearm in a public lobby of a police station.  However, the City of San Antonio attempts to enforce an ordinance that does exactly that when Plaintiff was arrested for violating Sec. 21-157 of the City's ordinance.

Sec. 21-157. - Carrying of weapons, including concealed handguns, on city-owned premises prohibited; posting of notice.

    (a) It is the intent of the city council to prohibit any person other than a commissioned security officer employed by the city and licensed peace officers from carrying or possessing weapons including concealed handguns on city-owned premises, including city-owned buildings, parking garages, lots, and other parking areas but excluding city-owned or operated public parks, streets and sidewalks.

    (b) It is the intent of the city council that the term weapon shall include a firearm, handgun, club, illegal knife, knife, and any prohibited weapon listed in Texas Penal Code Section 46.05(a) and have the same meaning as said items are defined in Section 46.01, Texas Penal Code.

    (c) The city council directs the city manager, or his designee to post the appropriate signs and such other notice, in accordance with Section 30.05 of the Texas Penal Code (the Criminal Trespass Law), to carry out the city council's above-stated intent.

    (d) The city manager is authorized to take all steps reasonable and necessary to deny entry or continued presence on city-owned premises to all such persons possessing weapons including concealed handguns, including prosecution of such violators for the offense of criminal trespass.

(Res. No. 95-52-66, 12-21-95)

## COUNT IV
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (*Monell* Liability)

169.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

**A. The City of San Antonio's policies, practices, and custom that fail to recognize Plaintiff's First and Second Amendment rights constitute a moving force behind violating Plaintiff's constitutional rights.**

170.    The City of San Antonio is liable for all damages suffered by the Plaintiff pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and 42 U.S.C. § 1983, based on an official policy or custom of the City of San Antonio police department, of which the City Council, the City Manager, the Mayor, and the Chief of Police all had actual or constructive knowledge that was a moving force behind the constitutional violates alleged herein.

171.    A municipal policy is "[a] policy statement, ordinance, regulation, or decision that

is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (per curiam). "[A] facially innocuous policy will support municipal liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407 (1997)).

172.    As described above, the City of San Antonio has an ordinance that criminalizes the carrying of firearms in public lobbies of municipal buildings in direct, knowing conflict with state and federal law.

173.    The City of San Antonio also permits its officers to indefinitely criminally trespass from city property individuals that engage in First Amendment protected activity, and then in further retaliation, allow the criminal trespass to be renewed and enforced without lawful authority.

174.    The City of San Antonio trains its officers on the enforcement of local ordinance and city policy concerning the carrying of firearms and filming of police in the public.

175.    Defendant Officers were acting under the color of law and acting pursuant to customs, practices, and policies of the City of San Antonio and the San Antonio Police Department when they deprived Plaintiff of the rights and privileges secured to him by the First, Second, and Fourteenth Amendments of the Constitution.  This was a direct result of the City of San Antonio failing to provide proper training on citizens' right to film police officers and display firearms in public spaces, which is a violation of 42 U.S.C. § 1983.

176.    Detaining and arresting individuals are part of a police officer's duties.  Police officers are expected to interact with members of the public that film them and verbally oppose

them.  Police officers are expected to interact with members of the public that legally display firearms.  Policymakers know this.  They are required to implement policies that require appropriate and measured responses while also protecting the rights of citizens.  The policies, practices, and customs of the City of San Antonio directly contradict these considerations.

177.    The Policymakers knew of these policies, practices, and customs but acted with deliberate indifference.  These violations should have been apparent to the Policymakers.

178.    The City of San Antonio's policies, practices, and custom were the moving force behind Plaintiff's constitutional violations.

**B.    The City of S failed to train its officers on a citizen's First and Second Amendment rights.**

179.    The City and its Policymakers failed to adequately train, supervise, and discipline its employees regarding the First Amendment rights of citizens to film and verbally criticize police, the reasons to effectuate an arrest or other seizure, when and where citizens are permitted to carry firearms, and when the specific authority and discretion to be applied when issuing criminal trespass warnings.

180.    "A municipality's failure to train its police officers can without question give rise to § 1983 liability."  *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009).

181.    The failure to train, supervise, and discipline its employees in this manner reflects a deliberate indifference on the parts of the City of San Antonio and its policymakers.

182.    Defendants' violations of Plaintiff's rights were obvious and a highly predictable consequence of insufficient training.

183.    While the City of San Antonio knew based on a pattern of conduct of its officers in targeting individuals that film them and openly carry in public spaces, it also should have known

that these interactions were likely since the City knew of complaints concerning its signage, that a city attorney informed them that the signage was unlawful, but still permitted the signage to be posted and enforced at the expense of Plaintiff's constitutional freedoms.

184.    There is a casual connection between the failure to train and the violation of Plaintiff's rights.  Had Defendants been properly trained as to Plaintiff's First, Second, and Fourteenth Amendment rights rights, they would have never attempted to stop Plaintiff from filming, or retaliate against him through detainment, arrest, and false charges.  They would have also permitted him to openly carry in public lobbies of municipal buildings without unlawfully arresting or disarming him.  Every officer that interacted with Plaintiff, as outlined above, acted contrary to how a reasonably trained officer would have acted in similar circumstances.

185.    Defendant City's failure to properly train its police officers, through an adequate training program, regarding First Amendment rights to film and verbally criticize police, lawful arrests, and a citizen's right to display firearms under both federal and state law, was the proximate cause of the violations of Plaintiff's constitutional rights.

**C.  The City of San Antonio failed to adequately supervise or discipline its officers for retaliating against Plaintiff through illegitimate criminal trespass warnings, unlawful arrests, unlawful searches and seizures, and through false charges, and in failing to do so, ratified and encouraged the conduct of its officers.**

186.    The City of San Antonio is liable for failing to supervise and discipline its officers for prior and current violations and the resulting lack of supervision:

(a)    The City and Police Chief failed to adequately supervise or discipline its employees in handling usual and recurring situations with which they deal;

(b)    The policymakers were deliberately indifferent to the need to supervise or discipline its officers or employees adequately;

(c)    The failure to adequately supervise and discipline its officers proximately caused the deprivation of Plaintiffs' constitutional rights; and

(d)     The City and its Policymakers failed to adequately supervise or discipline Defendant Officers for stopping Plaintiff from recording and disarming him, and then retaliating against him for exercising his constitutional rights to record, verbally criticize the government, and to lawfully carry a handgun in a public lobby of a municipal building.

187.    Despite having knowledge of Defendant Officers' violations, Defendant City and its Policymakers refused to adequately discipline Defendant Officers.  The City's Policymakers were aware of the out-of-control behavior of Defendant Lopez in directing the arrest of Plaintiff and keeping valid the illegitimate criminal trespass warning but failed to take any action.

188.    Defendant City's failure to adequately supervise or discipline its officers was therefore the moving force behind Plaintiff's damages.

189.    Defendant City's failure to investigate was a deliberate indifference of the conduct of the involved officers, and this failure was the proximate cause of the violations of Plaintiff's constitutional rights.

**D. The City of San Antonio failed to adequately investigate, and in failing to do so, ratified and encouraged the conduct of its officers.**

190.    In addition, Defendant City, as applicable, failed and refused to adequately investigate Defendant Officers' conduct.

191.    Plaintiff made several efforts to lodge formal complaints.  However, consistent with City policy, Plaintiff was only permitted to make an "informational" complaint.  The City also refused to disclose information to him, or to let him know the outcome of his complaints.

192.    The City and its Policymakers knew that as a direct consequence of giving broad discretion to officers and the Chief of Police as to what complaints to accept, and what complaints to actually investigate, that there would be no real accountability of its officers that violate constitutional rights.

193.    The City of San Antonio, by giving discretion as to what is investigated, and how

investigations occur, knew that Plaintiffs would be subject to retaliatory conduct that violates his First Amendment right to be free from retaliation, and that his complaints would be swept under the rug.

194.    Defendant City's failure to investigate, or decision to accept a complaint in the first place, constitutes deliberate indifference of the conduct of the involved officers, and this failure was the proximate cause of the violations of Plaintiffs' constitutional rights.

195.    Defendant City is directly responsible for the individual Defendants' conduct described herein.

**E.  Defendant City has a History of Being Hostile Toward State and Federal Authorities**

196.    San Antonio Police Officers swear the following oath when they begin their duties as law enforcement officers:

> I, [State Your Name], do solemnly swear, that I will faithfully execute the duties of the office of peace officer in the State of Texas, and will to the best of my ability preserve, protect, and defend the Constitution and laws of the United States and of this State, so help me God.[13, 14]

197.    Defendant City, the City of San Antonio, and its policymakers, through their ordinances which conflict with state laws and through their policies, practices, and customs which violate the rights enshrined in the Constitution, place their police officers in an insupportable position/untenable situation: Either they risk their employment, their ability to care for their families, and their financial stability for disobeying directives; or they break their oath of office, harm the people they have sworn to protect, and face lawsuits for following orders.

---

[13] The Texas Constitution, Article 16, Section 1(a).

[14] https://m.facebook.com/SanAntonioPD/videos/128533843580736/, accessed June 15, 2023.

198.    San Antonio Police Officers need better; San Antonio Police Officers deserve better.

199.    Defendant City's policymakers have broken the oath of office they too swore.  As a result, Plaintiff was harmed.

200.    When faced with another law that reminds local authorities that state law preempts local laws, Defendant City's policymakers have increasingly challenged who has the ultimate authority: the City or the State.

201.    House Bill 2127, which was signed by Governor Abbott on June 14, 2023, and goes into effect on September 1, 2023, is intended to curb the power that San Antonio clearly abuses.

202.    "'The bill is undemocratic,' San Antonio Mayor Ron Nirenberg said. 'It is probably the most undemocratic thing the Legislature has done, and that list is getting very long. Local voters have created city charters, and I can't imagine that they will be pleased to have their decisions usurped by lawmakers.'"[15]

203.    "'This is the most horrible thing that could happen to local government right now,' says District 4 Councilwoman Adriana Rocha Garcia."[16]

204.    City Attorney Andrew Segovia "said the city would defend its ordinances in court and does not plan to say any of its ordinances are void under the bill.  'The plan is to keep everything in place until it's challenged. . . .'"[17]

205.    Plaintiff now challenges those local policies that are in direct conflict with state and federal law, because these local policies are harming Plaintiff and interfering with his

---

[15] https://www.mysanantonio.com/news/local/article/texas-hb-2127-18104296.php, accessed June 15, 2023.

[16] https://foxsanantonio.com/newsletter-daily/local-leaders-against-what-they-call-death-star-bill-hb-2127, accessed June 15, 2023.

[17] https://www.ksat.com/news/local/2023/05/25/city-attorney-san-antonio-wont-take-ordinances-off-the-books-in-face-of-sweeping-preemption-bill/, accessed June 15, 2023.

constitutional rights.

## COUNT V
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
## (Declaratory Relief)

206.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

207.    Defendant City deprives Plaintiff of his federal constitutional rights to freedom of expression, to peaceably assemble, and to petition their government for redress of grievances, causing irreparable harm to Plaintiff.

208.    Defendant City also deprives Plaintiff of his rights, recognized under federal and state constitutions and law, to carry a firearm for the purposes of self defense within public spaces of municipal buildings where the State permits the carrying of firearms.

209.    Through continued enforcement of the city's policy respecting the issuance and enforcement of criminal trespass notices completely banning Plaintiff from all city property open to the public, Defendant City threatens further violations of those same rights.

210.    Plaintiff is therefore entitled to a declaration pursuant to 28 U.S.C. § 2201 that his rights arising under the Constitution have been violated by the actions of the Defendants and that the city's policy is facially unconstitutional and as applied to the activities of Plaintiff.

## COUNT VI
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
## (Injunctive Relief)

211.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

212.    Plaintiff continues to be deprived of his federal constitutional rights under the First, Second, and Fourteenth Amendments, causing him irreparable harm and threatening additional,

immediately impending irreparable injuries.

213.    Defendant City continues to maintain its policy of preventing Plaintiff from returning to City Hall, the San Antonio Police Department, and other city-owned property open to the public through enforcement and issuance of criminal trespass warnings in violation of 42 U.S.C. § 1983.

214.    Defendant City continues to maintain its policy of preventing Plaintiff from lawfully carrying a handgun in the public spaces of municipal buildings in direct conflict with state and federal law.

215.    Plaintiff is therefore entitled to an injunction preventing Defendant and its agents, employees, and other persons or entities acting on its behalf, from further enforcement of the criminal trespass notices issued to Plaintiff that completely bans him from all city-owned property that is otherwise open to the public, and to enjoin the City from prohibiting Plaintiff from openly carrying firearms in municipal buildings so long as he is in compliance with state and federal law.

## CLAIMS AGAINST DEFENDANT LIUETENANT LOPEZ

### COUNT VII
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment – Unlawfully Preventing Recording of a Police Officer)

216.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

217.    Plaintiff asserts this claim against Defendant Lopez.

218.    Defendant Lopez, at all relevant times, acted under the color of state law.

219.    On July 14, 2021, Plaintiff engaged in constitutionally protected conduct of recording government officials performing their duties in public while he was in the police station lobby open to the public.

220.    Plaintiff was not in violation of any time, place, manner restrictions.

221.    Defendant Lopez did not have any issues or concerns with Plaintiff's or anyone else's presence.  He just had a concern with Plaintiff filming.

222.    Plaintiff was instructed to stop recording and leave under threat of arrest.  Fearful of being arrested, he complied.

223.    However, Defendant Lopez had him arrested and had his recording stopped.

224.    Defendant Lopez intentionally impeded Plaintiff from exercising his clearly established right to film.

225.    Defendant Lopez's acts deprived Plaintiff of the of the rights, privileges, and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

226.    As a proximate cause of the illegal and unconstitutional acts of Defendant Lopez, Plaintiff was harmed and seeks nominal damages under this count.

**COUNT VIII**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(First Amendment – Retaliation)**

227.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

228.    Plaintiff asserts this claim against Defendant Lopez.

229.    Defendant Lopez, at all relevant times, acted under the color of state law.

230.    On July 14, 2021, Plaintiff was engaged in constitutionally protected conduct of recording the police and then engaged in verbally criticizing the police.  During this interaction, Plaintiff called Defendant Lopez "an idiot."

231.    In direct response to being called an idiot, Defendant Lopez used his power and authority to order the immediate seizure of Plaintiff.  He then stopped Plaintiff from recording.  He also issued a verbal and vague criminal trespass warning.

232.    Despite the City informing Plaintiff that this warning would be removed from the system, it allowed Defendant Lopez to keep it in place.  Then, when the warning was set to automatically expire on two separate occasions, Defendant Lopez renewed the warning.

233.    Defendant Lopez engaged in this conduct for the simple purpose of retaliating against him for engaging in protected conduct.

234.    Defendant Lopez's acts deprived Plaintiff of the of the rights, privileges, and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

235.    As a proximate cause of the illegal and unconstitutional acts of Defendant Lopez, Plaintiff was harmed and seeks nominal damages under this count.

### COUNT IX
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment – Retaliatory Arrest)

236.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

237.    Plaintiff asserts this claim against Defendant Lopez.

238.    Defendant Lopez, at all relevant times, acted under the color of state law.

239.    On July 14, 2021, after being seized and escorted out of the building, Plaintiff went back in to obtain a written copy of the criminal trespass warning so that he knew exactly what he was being ordered to do or not do.  A city employee permitted him to wait in the lobby.

240.    Once Defendant Lopez knew he was in the building, he ordered the arrest of Plaintiff, and then had him charged with Criminal Trespass under Section 30.05 of the Texas Penal Code.

241.    Defendant Lopez knew that Plaintiff did not have sufficient notice that entry was forbidden, or that he received notice to depart but failed to do.  He knew that a city employee permitted Plaintiff to wait.

242.    Therefore, Defendant Lopez lacked probable cause or any lawful authority to arrest Plaintiff.

243.    Defendant Lopez intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently had Plaintiff detained, handcuffed, and arrested purely because of Plaintiff's earlier criticism of him.

244.    Defendant Lopez intended to chill Plaintiff's First Amendment activities through this arrest.

245.    Defendant Lopez's acts deprived Plaintiff of the of the rights, privileges, and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

246.    As a proximate cause of the illegal and unconstitutional acts of Defendant Lopez, Plaintiff was harmed and seeks nominal damages under this count.

**COUNT X**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(First Amendment – Retaliatory Prosecution)**

247.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

248.    Plaintiff asserts this claim against Defendant Lopez.

249.    Defendant Lopez, at all relevant times, acted under the color of state law, maliciously charged Plaintiff with criminal trespass arising from the incident on July 14, 2021.

250.    This adverse act was done in retaliation for Plaintiff engaging in constitutionally protected conduct as described herein, and to prevent him from engaging in such conduct, specifically filming and verbally criticizing police, and lodging complaints concerning department policy about prohibiting the filming and carrying of firearms, which is inconsistent with state and federal law.

251.    These false charges were dismissed in his favor, but not until after Plaintiff spent nearly a month in jail, had his bond amount increased twice, and was subjected to two other charges (which were also dismissed in his favor).

252.    Defendant Lopez's acts deprived Plaintiff of the of the rights, privileges, and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

253.    As a proximate cause of the illegal and unconstitutional acts of Defendant Lopez, Plaintiff was harmed and seeks damages.

## CLAIMS AGAINST DEFENDANT OFFICER VALERO

### COUNT XI
### VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment – Unlawfully Preventing Recording of a Police Officer)

254.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

255.    Plaintiff asserts this claim against Defendant Valero.

256.    Defendant Valero, at all relevant times, acted under the color of state law.

257.    On October 5, 2022, Plaintiff engaged in constitutionally protected conduct of recording police performing their duties in public while in a public area observing an incident alongside other individuals and media.

258.    Plaintiff was not in violation of any time, place, manner restrictions.

259.    Defendant Valero was familiar with Plaintiff and he did not like his recording.  He did not have any concerns with KSAT (a local news organization) or other individuals in the area. He only had a problem with Plaintiff being there.

260.    Defendant Valero did not want Plaintiff recording, so he gave him vague instructions to move.  When Plaintiff sought clarification, Defendant Valero arrested him.  The purpose of this conduct was to stop Plaintiff from recording.

261.    Defendant Valero intentionally impeded Plaintiff from exercising his clearly established right to film.

262.    Defendant Valero's acts deprived Plaintiff of the of the rights, privileges, and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

263.    As a proximate cause of the illegal and unconstitutional acts of Defendant Valero, Plaintiff was harmed and seeks nominal damages under this count.

**COUNT XII**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983**
**(First Amendment – Retaliatory Arrest)**

264.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

265.    Plaintiff asserts this claim against Defendant Valero.

266.    Defendant Valero, at all relevant times, acted under the color of state law.

267.    On October 5, 2022, Defendant Valero arrested Plaintiff with Interference with Public Duties.  Despite others in the area, and even in closer vicinity to the scene than Plaintiff, only Plaintiff was arrested.

268.    Defendant Valero lacked probable cause or any lawful basis to arrest Plaintiff. Even if he had probable cause, Plaintiff is entitled to the *Nieves v. Bartlett* exception where he is not required to demonstrate probable cause to pursue this claim.

269.    Defendant Valero intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently had Plaintiff detained, handcuffed, and arrested purely because of Plaintiff being known as an individual that exercises his right to film police, and was engaging in that conduct at the current time.

270.    Defendant Valero intended to chill Plaintiff's First Amendment activities through this arrest.

271.    Defendant Valero's acts deprived Plaintiff of the of the rights, privileges, and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

272.    As a proximate cause of the illegal and unconstitutional acts of Defendant Valero, Plaintiff was harmed and seeks nominal damages under this count.

## COUNT XIII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment – Retaliatory Prosecution)

273.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein. Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

274.    Plaintiff asserts this claim against Defendant Valero.

275.    Defendant Valero, at all relevant times, acted under the color of state law, maliciously charged Plaintiff with Interference with Public Duties arising out of the October 5, 2022 incident.

276.    This adverse act was done in retaliation for Plaintiff engaging in constitutionally protected conduct as described herein, and to prevent him from engaging in such conduct, specifically filming police.

277.    These false charges were dismissed in his favor, but not until after Plaintiff was jailed.

278.    Defendant Valero's acts deprived Plaintiff of the of the rights, privileges, and immunities guaranteed to citizens of the United States by the First and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

279.    As a proximate cause of the illegal and unconstitutional acts of Defendant Valero, Plaintiff was harmed and seeks damages.

## CLAIMS AGAINST DEFENDANT CONTRERAS

## COUNT XIV
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (First Amendment - Retaliation)

280.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

281.    Plaintiff asserts this claim against Defendant Officer Contreras.

282.    While operating under the color of state law, Defendant Contreras, on February 13, 2023, initiated the seizure and arrest of Plaintiff in direct response to Plaintiff challenging him on the validity of the signage that prohibited Plaintiff from openly carrying a firearm in the public lobby of the police station.

283.    The verbal criticism, and the wearing of the firearm as a protected symbol, constitutes protected conduct that Plaintiff was engaged in and that Defendant Contreras intended to, and did, interfere with.

284.    Defendant Contreras had no knowledge of any facts or circumstances which would lead a reasonable person to believe that Plaintiff committed any offense that justified Defendant Contreras' conduct.

285.    It is clearly established that it is a First Amendment violation if an officer retaliates against someone in response to protected speech. *Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir. 2008) (citing *Lewis v. City of New Orleans*, 415 U.S. 130, 134-35, (1974) (Powell, J., concurring)) ("Trained officers must exercise restraint when confronted with a citizen's anger over police action."); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) ("The First Amendment prohibits . . . adverse governmental action against an individual in retaliation for the exercise of protected speech activities."); *see Hill.*, 482 U.S. at 462 ("[The] First Amendment protects a significant

amount of verbal criticism and challenge directed at police officers."). Defendant Gibson violated this right.

286.    Defendant Contreras would not have arrested or seized Plaintiff had Plaintiff not questioned his conduct.

287.    Defendant Contreras' conduct was made for one purpose: in retaliation to Plaintiff for challenging him on the enforcement of the signs (policy) that was inconsistent with state law.

288.    Defendant Contreras' conduct deprived Plaintiff of the rights, privileges, and immunities guaranteed to citizens of the United States by the First, Second, Fourth, and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

289.    As a direct and proximate result of Defendant Contreras' unlawful actions, Plaintiff was harmed and suffered damages as a result. In the alternative, Plaintiff is entitled to nominal damages.

## COUNT XV
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – False Arrest)

290.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

291.    Plaintiff has a clearly established right to be free from unlawful arrest. *Freeman v. Gore*, 483 F.3d 404, 411-13 (5th Cir. 2007). "[A] seizure without probable cause to believe the person is guilty of a crime violates the Fourth Amendment." *United States v. Massi*, 761 F.3d 512, 523 (5th Cir. 2014).

292.    On February 23, 2023, Defendant Contreras knew that Plaintiff was not committing any crime when effected an unlawful arrest or seizure without any lawful basis. He did not have any reasonable suspicion or probable cause to think that any crime was being committed.

Defendant Contreras knew that Plaintiff had a lawful right to openly carry the pistol in the public lobby of the police department.

293.    Defendant Contreras' conduct was done intentionally, knowingly, maliciously, reckless, unreasonably, and with gross negligence.

294.    As a direct and proximate result of Defendant Contreras' unlawful actions, Plaintiff was harmed.

## COUNT XVI
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. 1983
### (Fourth Amendment – Unlawful Search/Seizure)

295.    Plaintiff repeats, reiterates, and re-alleges each and every allegation set forth above and incorporates them as if fully set forth herein.

296.    At all times relevant herein, Defendant Contreras was acting under the color of State law.

297.    It is well-established that police officers are not permitted to make a search incident to an unlawful arrest.  *See United States v. Hernandez*, 825 F.2d 846, 852 (5th Cir. 1987) (explaining that an arrest must be lawful for the search-incident-to-arrest exception to apply).

298.    On February 23, 2023, Defendant Contreras created meaningful interference with Plaintiff's possessory interests in his property when he disarmed Plaintiff.

299.    Defendant Contreras unlawfully arrested Plaintiff as he lacked probable cause to arrest him.  He then searched Plaintiff, seized his belongings, to include his firearm, without any lawful basis to do so.

300.    Plaintiff was harmed as a result of Defendants' unlawful seizure.

## DAMAGES

301.    A **Declaration** that Defendant City's posting and enforcing signage prohibiting weapons in public areas of City buildings contrary to State law violates the Second and Fourth Amendments to the United States Constitution.

302.    A **Declaration** that Defendant City's threatening and retaliating against people who film police officers by threatening arrest and falsely arresting and charging them, from criminally trespassing them from public areas of City-owned buildings or land, and from preventing their complaints about the same from being investigated by the San Antonio Police Department's internal affairs violates the First and Fourth Amendments to the United States Constitution.

303.    **Injunctive relief** barring Defendant City from further posting unlawful signage prohibiting weapons in public areas of City buildings contrary to State law.

304.    **Injunctive relief** barring Defendant City from further policies, practice, and custom to retaliate against individuals who film their police officers by by threatening arrest and falsely arresting and charging them, from criminally trespassing them from public areas of City-owned buildings or land, and from preventing their complaints about the same from being investigated by the San Antonio Police Department's internal affairs.

305.    **Actual damages.**  Defendants' acts or omissions were a proximate cause and the moving force behind the constitutional violations, and Plaintiff suffered damages for which Defendants should be held jointly and severally liable.

306.    **Punitive/Exemplary Damages against individual defendants in their individual capacities.**  Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Plaintiff asserts that the conduct of the

individual defendants herein, in their individual capacities, are liable to Plaintiff for punitive or exemplary damages.

307.    **Nominal damages** for First Amendment violations.

308.    Prejudgment and post-judgment interest.

309.    Costs of court.

310.    Reasonable and necessary attorney's fees incurred by the Plaintiff through trial, and reasonable and necessary attorney fees that may be incurred by Plaintiffs for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

311.    Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional limits of the court.

## JURY DEMAND

312.    Plaintiff hereby demands a trial by jury on all issues so triable, pursuant to Fed. R. Civ. P. 38(b).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment and prays for the following relief against Defendants:

a.  Full and fair compensatory damages to be assessed against each and every Defendant in an amount to be determined by a jury;

b.  Reasonable attorney's fees and the costs and disbursements of this action;

c.  Any such other relief as appears just and proper.

Respectfully submitted,

**GRABLE GRIMSHAW PLLC**

*/s/ Brandon J. Grable*
**BRANDON J. GRABLE**
Texas State Bar No. 24086983
brandon@g2.law
1603 Babcock Road, Suite 280
San Antonio, Texas 78229
Telephone: (210) 963-5297
Facsimile: (210) 641-3332
**COUNSEL FOR PLAINTIFF**